## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

### JAMES M. PLASKITT, SR., ET AL. v. BLACK DIAMOND TRAILER COMPANY, INCORPORATED, ET AL.

December 6, 1968.

Record No. 6784.

Present, All the Justices.

*Jackson S. White, Jr.* (*Penn, Stuart & Miller*, on brief), for plaintiffs in error.

*Bradley Roberts* (*Stant & Roberts*, on brief), for defendants in error.

HARRISON, J., delivered the opinion of the court.

James M. Plaskitt, Sr., James M. Plaskitt, Jr. and James M. Plaskitt and Son, Incorporated, instituted their action against Black Diamond Trailer Company, Incorporated and Enterprise-Black Diamond Corporation, on September 17, 1965. They alleged the breach without cause of a contract made in September, 1960, by the said parties, and a loss thereby to the Plaskitts of money they reasonably could have expected to receive as commissions on purchases of Black Diamond Trailers by the railroad industry. The trial court sustained demurrers filed by Black Diamond to the original and amended motions for

judgment of the Plaskitts and dismissed the amended motion. We granted a writ of error to this final judgment of the court.

The Plaskitts, who represent themselves as experienced in selling to and dealing with the railroad industry, with business offices in Washington, D. C. and Upperville, Virginia, allege that on September 23, 1960, they entered into an agreement with Black Diamond whereby they were appointed "exclusive railway sales agents for Black Diamond Trailers" and were to receive a 2% commission on all sales.

Filed with the pleadings are copies of a letter dated September 23, 1960, written on behalf of Black Diamond, to eleven railroad companies, announcing the appointment of the Plaskitts as such exclusive railroad sales agents. The letter stated that the Plaskitts had considerable experience in railway sales, and they would welcome the opportunity to work with the railroads on their truck-trailer requirements.

On the same day, Black Diamond also wrote the Plaskitts a letter, advising them that it would start writing the purchasing officers of the companies whose names were given it by the Plaskitts. In the letter, Black Diamond expressed pleasure at having the Plaskitts represent them "with our railway sales" and confirmed "our understanding that we will quote these trailers at the best possible price, and in each instance add 2 percent commission for" the Plaskitts.

These letters are the only written evidence of the agreement between the parties. The contract was precipitated by the advent of "piggy-back" trailers as a means of conveying goods by railroad, and Black Diamond was interested in selling this type trailer to the railroad industry.

The Plaskitts allege in their pleadings that they agreed to attempt to develop markets and to promote and obtain sales of Black Diamond trailers as "piggy-back" carriers for goods on railroads; and that as a result of their efforts, the Company built up a large and profitable business in the manufacture of "piggy-back" trailers for the railroad industry. They also allege that they sought and received assurances that the Company would honor the agreement, pay the commissions on all railway sales, and otherwise protect the Plaskitts as its sales agents.

On September 27, 1962, the Company gave the Plaskitts written notice that, effective December 31, 1962, the Company's railway sales activities would be conducted by its own sales personnel, and that the Plaskitts thereafter would receive no further commissions on such

sales. The new sales arrangement was announced to the railroad industry at the same time.

It is admitted that the agreement between the Plaskitts and Black Diamond did not provide a specific time for its duration. The position of Black Diamond is that either party was entitled to terminate the agreement at will, provided reasonable notice of termination was given, and that three months constituted such notice. In their brief the Plaskitts say that their complaint ". . . is that their agreement was terminated by Black Diamond before they had an opportunity to recover the reasonable value of their services and their out-of-pocket expenses, or had a reasonable opportunity to profit from the contract". Thus the issue is framed for our consideration.

Black Diamond contends that the decision here is controlled by *Stonega Coal and Coke Co.* v. *Louisville & N. R. Co.*, 106 Va. 223, 55 S. E. 551, 9 L. R. A. (n.s.) 1184 (1906). The Plaskitts say that in the half century which has elapsed since *Stonega* was decided, the "rule of reasonable time" has been enunciated and developed by the courts, and that we should adopt it. They cite *Allied Equipment Company* v. *Weber Engineered Prods., Inc.*, 237 F. 2d 879 (4th Cir. 1956), and other cases and authorities, including IV Williston, Contracts, (rev. ed.) § 1027A at pp. 2848-52. In *Allied Equipment*, a statement of this rule was made by Judge Prettyman, who said:

> "It is well settled that, where an employed agent, in reliance upon the agency and with the knowledge of his principal, expends funds in the interest of the agency and of the principal, the principal is committed to the agency for a reasonable period of time, so that the agent may thus recoup his expenditures. As Professor Williston says, 'It is the settled law of agency that if the agent or employee furnishes a consideration in addition to his mere services, he is deemed to have purchased the employment for at least a reasonable period where the duration of the employment is not otherwise defined.'" 237 F. 2d at p. 882.

That case involved a manufacturer which gave a wholesaler an exclusive distributorship for its products in eighty-five counties of Virginia. As a result of the contract, the wholesaler established an extensive system of dealerships for the manufacturer's products, leased a new building in reliance upon representations that were made by the manufacturer, increased the number of its dealers and otherwise incurred expenses and changed its position by virtue of the contract.

*Jack's Cookie Co.* v. *Brooks*, 227 F. 2d 935 (4th Cir. 1955), cited by counsel for the Plaskitts, involved a wholesale distributorship for an indefinite period wherein Brooks, for a commission of 5% on sales, set up a distributive system, agreed to pay his own expenses, employed additional personnel, and paid one-half the salary of an experienced man to accompany and assist route salesmen. There the court held that the case should have been submitted to the jury on the issue of breach of contract because in its opinion:

". . . the evidence, taken in the light most favorable to the agent, indicated something more than a contract in which the agent is appointed merely to sell the goods of a manufacturer on commission, and there is no promise on either side to continue the relationship for a definite period. In such event each sale constitutes the acceptance of an offer in a series of independent transactions and the manufacturer fulfills his agreement by paying the stipulated commission and is ordinarily at liberty to terminate the arrangement at will without breach of contract." 227 F. 2d at p. 938.

*Hammond* v. *C. I. T. Financial Corp.*, 203 F. 2d 705 (2d Cir. 1953), involved a real estate commission claimed by the plaintiff who was given the exclusive right to sell a wholly owned subsidiary corporation of the defendant with no duration of the agency specified. The defendant made his own sale of the property without payment of a commission to plaintiff. A recovery was permitted. However, in that case there was a finding of fact that there had been no termination of plaintiff's contract prior to a sale of the property by the defendant.

*General Tire & Rubber Co.* v. *Distributors, Inc.*, 253 N. C. 459, 117 S. E. 2d 479 (1960), dealt with a distributor's contract, and the court said:

"Where the duration of a distributor contract is indefinite and distributor has expended substantial sums in establishing and promoting the distributorship and such expenditures were within the contemplation of the parties, the contract may be terminated after the lapse of a reasonable time. . . ." 253 N. C. at p. 472, 117 S. E. 2d at p. 489.

In *Erskine* v. *Chevrolet Motors Co.*, 185 N. C. 479, 117 S. E. 706 (1923), Erskine, whose agency agreement was cancelled by Chev-

rolet, was permitted to recover for loss of future profits. However, it was established there that the plaintiff leased a building, purchased equipment, contracted for advertisement and incurred other expenses.

The cases upon which the Plaskitts rely have arisen from dealerships and distributorships and from arrangements more in the nature of a brokerage or a sales agency. The agent, in addition to making sales, furnished additional consideration.

We are not confronted here with a dealership, a distributorship, a consignee of goods or a sales agency. In the instant case, the Plaskitts were individual salesmen. Their sole responsibility and commitment to Black Diamond was to solicit orders for trailers which the Company could accept or reject. If accepted, they, as salesmen, were to receive a 2% commission on the gross price. The Plaskitts were not required to establish facilities, take a trailer on consignment, carry spare parts, or do anything other than contact a number of railroads, and persuade them to buy Black Diamond "piggy-back" trailers.

The only thing the Plaskitts had to provide was their personal services. Of necessity, they incurred some expenses in writing, telephoning or making personal calls on repersentatives of the railroad companies. This was an incident of selling, and in the performance of the personal service of selling—far different from the commitments, arrangements and obligations assumed and performed by the agents involved in the cases discussed in counsel's brief. The allegations of what the Plaskitts did in reliance upon their agreement with Black Diamond are vague, but, in any event, they were such things as would normally be done by a salesman in the performance of personal services.

For reasons which the record does not disclose, the parties entered into an agreement for an indefinite and an indeterminate period. There is no question here of overreaching, or of one party to an agreement taking an unfair advantage of the other. We can only assume that the parties did not agree on a definite termination date of their contract because they did not wish to do so. Apparently Black Diamond was willing for the Plaskitts to be its exclusive salesmen and to pay them a commission on sales until it decided otherwise, or the Plaskitts terminated the contract. And the Plaskitts were willing to solicit orders for Black Diamond trailers for a commission of 2% for each order accepted and trailer sold until they, or Black Diamond, decided to terminate the arrangement.

Nowhere is it claimed that the Plaskitts were not paid full commis-

sion for all trailers sold by them to railroads between the inception of the contract and its termination. Manifestly the agreement of September, 1960 between the parties hereto was terminable at will by either party. For us to hold otherwise would necessitate our making a contract for the Plaskitts and Black Diamond which they did not make for themselves. We would have to insert an essential element that is omitted—a date for its termination. The Plaskitts concede that the contract was not to be perpetual, and that Black Diamond had the power to terminate it after a reasonable time—that being an undisclosed, indeterminate and uncertain period within which the Plaskitts could have made a profit. Were the court to attempt to fix a date within which the Plaskitts could have made a profit, it would not only be confronted with the involvements incident to determining when a profit had been made, but also how much profit is reasonable.

The authorities are in substantial agreement as to the law which controls in the absence of an express agreement as to the length of employment.

In 17 Am. Jur. 2d, Contracts, § 486, pp. 956, 957, we find:

"A contract which provides that it is to continue for a more or less indefinite period may be held to continue for a reasonable time under the circumstances. Indeed, it is said to be the general rule that the law implies a reasonable time where the continuation of a contract is without definite duration. *However, some contracts which mention no period of duration are construed as terminable at will; for instance, this is generally true of a contract for services which does not specify the duration of the contract.* A more guarded statement is that in contracts for personal service and special confidence *there is an implication that the parties intend that it shall not be prolonged if either of the parties shall become dissatisfied.* So, generally, where the parties to a contract express no period for its duration and none can be implied from the nature of the contract or from the circumstances surrounding them, the only reasonable intention that can be imputed to the parties is that the contract may be terminated by either on giving reasonable notice of his intention to the other." (Emphasis supplied.)

See also 17A C. J. S., Contracts, § 398, pp. 478, 479 ; 35 Am. Jur., Master and Servant, § 19, pp. 457, 458; and *Title Ins. Co. of Richmond* v. *Howell*, 158 Va. 713, 718, 164 S. E. 387, 389 (1932).

In the majority of cases that have followed "the rule of reasonable time" in construing a contract for an indefinite period, and a recovery has been allowed, there was a consideration other than the services to be rendered by an employee or agency. Typical is California where its courts hold that if a contract of employment or agency for an indefinite period is based on some consideration other than the services to be rendered, it will continue for a reasonable period of time. The other consideration need not be unrelated to the services to be performed. The requirement is that the consideration be other than the services to be rendered as an employee or agent. See *J. C. Millett Co.* v. *Park & Tilford Distillers Corp.*, 123 F. Supp. 484 (N. D. Cal. 1954); *Hunt Foods, Inc.* v. *Phillips*, 248 F. 2d 23 (9th Cir. 1957).

A careful reading of the original and amended motions for judgment, and the exhibits filed therewith, impels us to the conclusion that the Plaskitts did not allege any consideration for their agreement with Black Diamond which enables the court to find any contract other than one terminable at will. The consideration flowing to Black Diamond was the personal services to be rendered it by the Plaskitts as salesmen. The consideration flowing to the Plaskitts was the commission that they were to receive from Black Diamond on sales. The obligation of the Plaskitts was to attempt to sell trailers. The obligation of Black Diamond was to pay a commission on the trailers sold.

We agree with counsel for Black Diamond that the decision in this case is controlled by *Stonega Coal and Coke Co.* v. *Louisville & N. R. Co.*, 106 Va. 223, 55 S. E. 551, 9 L. R. A. (n.s.) 1184 (1906). The contract involved there was between a coal company and a railroad. The coal company was interested in developing its property and opening coal mines. The railroad company was anxious that the mines be developed and agreed that if the coal company would build a line from its mines and plant to the railroad yards, and give the railroad free right to use the line, the railroad would transport empty cars from its yards to the mines, and loaded cars from the mines to its yards, free of charge. This arrangement continued about seven years and to December, 1902, when the railroad notified the coal company that it would cease to furnish empty cars or haul loaded cars to its yards free of charge after February 15, 1903. Action was brought by the coal company, and the trial court sustained the railroad's demurrer, which action was affirmed by our court.

This case has been accepted for more than fifty years as authority for the proposition that where a contract sued on is one for the ren-

dition of services, and there is nothing said in the agreement as to the time during which it should continue, and the period of its intended duration cannot be determined from a fair inference from its provisions, either party is ordinarily able to terminate it at will on giving reasonable notice of its intention to do so. In the course of its opinion in *Stonega* the court said:

"The first question to be considered is whether under the contract between the parties the defendant had the right to terminate the arrangement into which they had entered, upon reasonable notice. If it had, there can be no recovery in this case, and the demurrer was properly sustained.

"The contract sued on was one for the rendition of services on the part of the railroad company. There is nothing said in the agreement as to the time during which it should continue. Does it, when considered in connection with the circumstances under which it was made, furnish the means of determining its duration? This is essential, because when a contract calls for the rendition of services, if it is so far incomplete as that the period of its intended duration cannot be determined by a fair inference from its provisions either party is ordinarily at liberty to terminate it at will on giving reasonable notice of his intention to do so. This is the statement of the general rule as made by the court in *Miss. Riv. Logging Co.* v. *Robson*, 69 Fed. Rep. 773, 779, one of the cases chiefly relied on by the plaintiff to sustain its contention, and is sustained by the authorities.

"While the court, in construing a contract, may take into view the circumstances under which it was made, yet when a breach of it is averred its language must determine to what the parties to it have bound themselves. Courts are not authorized to make contracts for them or to add any stipulation which they have not seen proper to insert. What is there in the contract, viewed in the light of the circumstances surrounding its execution, which will show its duration? Was it to continue for any definite number of years, or as long as the coal and iron company or its lessees saw proper to mine coal and manufacture coke, or until all the coal on the ten thousand acres had been mined and hauled away, or for any other definite period? The question is not what would have been a reasonable contract, nor what it may be supposed or conjectured the contracting parties contemplated or anticipated when the contract was entered into; but what did they agree to as evidenced by their

contract. It may be that the coal and iron company, when it entered into the arrangement expected it to last as long as it or its assignees saw proper to mine coal and manufacture coke, or until the coal upon the lands on Callahan creek was exhausted; but if it did, it failed to give that expectation the sanction or binding force of a contract. The parties to the contract seem to have left out of consideration its duration, or at least failed to make it the subject of contract obligation." 106 Va. at pp. 226, 227, 55 S. E. at p. 552.

In *Stutzman* v. *Nash & Son*, 189 Va. 438, 446, 53 S. E. 2d 45, 49 (1949), involving a claim for breach of a contract for the exclusive right to sell a cleaning product, *Stonega* was cited as authority for the proposition that:

"As to the written contract, it will be observed that there is nothing said as to the time during which it should continue. There is nothing in the circumstances to determine its duration. Either party was, therefore, at liberty to terminate it at will, on giving reasonable notice of the intention to do so. [Citing case.]"

In *Town of Vinton* v. *City of Roanoke*, 195 Va. 881, 895, 80 S. E. 2d 608, 616 (1954), it is said:

" 'When a contract calls for the rendition of services and it is so incomplete that its intended duration cannot be determined by a fair inference from its terms, either party is, as a rule, entitled to terminate it at will after reasonable notice of his intention to do so.' " [Citing *Stonega, supra.*]

We continue of opinion that the principle enunciated in *Stonega* is sound and adhere to it. In view of our ruling it is unnecessary that we consider other assignments of error made and discussed in the briefs.

The action of the trial court in sustaining the demurrers and dismissing the amended motion for judgment is therefore

*Affirmed.*

GORDON, J., Concurring in Result

The majority opinion reaffirms a rule that originated more than sixty years ago with *Stonega Coal Co.* v. *Louisville & Nashville R.R.*

Co., 106 Va. 223, 55 S. E. 551 (1906). Believing that rule can be supported only because it has been repeated in the past, I serve notice that I will not consider myself bound by it in the future. And I hope this opinion may free other members of the Court from any future obligation to adhere to that rule.

In September 1960, the Plaskitts and Black Diamond made a contract by which Black Diamond appointed the Plaskitts its exclusive sales agents for piggy-back trailers and, as consideration for sales commissions, the Plaskitts agreed to use their best efforts to develop markets and to promote and obtain sales of such trailers.[1] During the next two years the Plaskitts devoted their energies and spent their moneys to carry out their commitment under the contract, and succeeded in "building up a large and profitable business" for Black Diamond. In September 1962 Black Diamond notified the Plaskitts that the contract would be terminated on December 31, 1962. The commissions paid by Black Diamond to the Plaskitts "did not even cover the amount of the expenses the Plaskitts incurred on [Black Diamond's] behalf in reliance upon [the] agreement".

*Stonega* recognized a rule that should be applied in this case: "[W]hen a contract calls for the rendition of services, if it is so far incomplete as that the period of its intended duration cannot be determined by a fair inference from its provisions either party is ordinarily at liberty to terminate it at will on giving reasonable notice of his intention to do so." 106 Va. at 226, 55 S.E. at 552. Applying that rule to this case, we should reverse the judgment because the trier of fact could reasonably infer from the contract and the circumstances that the parties intended that the contract should continue in effect for a reasonable period of time.

But other language in *Stonega* and language in a subsequent Virginia case[2] support the conclusion that this Court has committed itself

[1] The facts recited in this paragraph were alleged by the Plaskitts and, therefore, must be accepted since the trial court sustained Black Diamond's demurrer.

[2] "The question is not what would have been a reasonable contract, nor what it may be supposed or conjectured the contracting parties contemplated or anticipated when the contract was entered into; but what did they agree to as evidenced by their contract. * * * The parties to the contract seem to have left out of consideration its duration, or at least failed to make it the subject of contract obligation." *Stonega Coal Co.* v. *Louisville & Nashville R.R. Co.*, *supra* at 227, 55 S.E. at 552.

"As to the written contract, it will be observed that there is nothing said as to the time during which it should continue. There is nothing in the circumstances to determine its duration. Either party was, therefore, at liberty to terminate it at will, on giving reasonable notice of the intention to do so." *Stutzman* v. *Nash & Son*, 189 Va. 438, 446, 53 S.E. 2d 45, 49 (1949)

On the other hand, neither *Stonega* nor *Stutzman* should control this case. The

to a quite different rule: When a contract specifies no time for its duration, no inference can be drawn that the parties intended the contract to remain in force for a reasonable time. And that rule dictates affirmance of this case. So I do not dissent, but only because bench and bar may have relied on that rule as the settled Virginia law.

But I believe the Court should, at the next opportunity, repudiate the rule that when a contract for the rendition of services specifies no period for its duration, no inference as to duration can be drawn. Authority and reason support its repudiation and the substitution of a different rule, as shown by the following excerpts from 9 *Williston, Contracts* § 1017A (3d ed. 1967):[3]

> ."Modern industry has increasingly resorted to two general types of exclusive contracts for the distribution of its products, namely, the exclusive sales agency contract and the exclusive sales and distribution contract, or a combination of these.
>
> "Although there is a marked distinction between a true sales agency contract and a sales and distribution contract for many purposes, yet for the purpose of determining the duration of the relation between the parties and the power to terminate it, they are so substantially similar that cases of either type are authoritative on this point for the other.[4]
>
> "Any one of these types of agreement, however, since they are bilateral in nature, imposes weighty obligations on both sides during its continuance.

issue in *Stonega* was whether the contract should continue perpetually, not whether it should continue for a reasonable time. In *Stutzman*, the plaintiff-manufacturer brought suit against the sales agent for breach of an exclusive sales contract. The defendant-agent alleged that the manufacturer had failed to carry out its obligation to supply sufficient goods to meet the demands of the trade, which the agent had built up by expending substantial moneys; that, in fact, the manufacturer had abandoned the manufacture of the product; and that it had become necessary for the agent to obtain a supply of goods from other sources. This Court upheld the chancellor's finding for the defendant.

The majority opinion relies on another Virginia case, *Town of Vinton v. City of Roanoke,* 195 Va. 881, 80 S.E.2d 608 (1954). Like *Stonega,* the issue in *Town of Vinton* was whether the contract should continue perpetually, not whether it should continue for a reasonable time.

[3] See also *General Tire & Rubber Co. v. Distributors, Inc.,* 253 N.C. 459, 117 S.E.2d 479 (1960); *Erskine v. Chevrolet Motor Co.,* 185 N.C. 479, 117 S.E. 706 (1923); 1 *Corbin, Contracts* § 96 at 413 (1963).

[4] As authority for the statement that cases involving sales and distribution contracts are authoritative in cases involving sales agency contracts, Williston cites *Foster-Porter Enterprises, Inc. v. DeMare,* 198 Md. 20, 81 A.2d 325 (1951); *Superior Concrete Accessories, Inc. v. Kemper,* 284 S.W. 2d 482 (Mo. 1955).

.''(''* * *

"Usually, in these situations, the agent or buyer, as the case may be, is doing more than merely offering to render services or to pay the price for the goods. It is at least expected and understood, and, in fact, frequently expressly provided in the contract, that he is to make a substantial investment and to build up or maintain a business establishment for the distribution of the manufacturer's products. On the other hand, the manufacturer intrusts the fate of his product in the defined territory exclusively to this agent or distributor, and, in thus forbearing to resort to other sources of distribution in that locality, he gives up a valuable right. The validity of such exclusive sales agencies or of such exclusive sales and distribution contracts during their continuance is obvious. As executory agreements, they are binding if they satisfy the requisites of manifested mutual assent and consideration.

"Such difficulty as exists in protecting the agent or distributor from the hardship of summary termination is due either (1) to the actual or supposed lack of any definite period fixed in the manufacturer's promise, or (2) to the actual or supposed ability of the agent or distributor to terminate the arrangement at will, or both.

"To meet these objections, it is usually necessary to find an express or implied definition of the period of the manufacturer's obligation, and either a similar definition of the agent's or distributor's period of undertaking, or else that the agreement fairly interpreted gives the agent or distributor an enforceable option to hold the manufacturer for a fixed or reasonable period of time while remaining free himself to terminate the relationship at will.

"These cases as they have come before the courts present several variations with respect to termination.

" * * * [The author then discusses (1) agreements where a definite time is fixed on both sides, and (2) agreements where a determinable time is fixed on one side only.]

"(3) Where the agreement contains no provision whatever for its termination.

"Quite properly, this has frequently been held an enforceable executory contract, binding upon each party for a reasonable time:[5]

---

[5] As authority for the statement in the text, Williston cites: *Willcox & Gibbs Sewing Machine Co.* v. *Ewing*, 141 U.S. 627, 35 L.ed. 882, 12 S.Ct. 94 (1891); *Abrams* v. *Keith Co.*, 30 F.2d 90 (3rd Cir. 1929); *Moon Motor Car Co. of N.Y.* v. *Moon Motor Car Co.*, 29 F.2d 3 (2d Cir. 1928); *Boehm* v. *Spreckels*, 183 Cal. 239, 191 P.5 (1920); *Staroske* v. *Pulitzer Pub. Co.*, 235 Mo. 67, 138 S.W. 36 (1911); *Dunn* v. *Birmingham Stove & Range Co.*, 170 Okla. 452, 44 P.2d 88 (1935); *Price* v. *Confair*, 366 Pa. 538,

" 'The contract of agency being indefinite as to the time it was to run, what was it duration? Where the continuation of a contract is without definite duration the law implies a reasonable time, and what is a reasonable time is to be determined from the general nature and circumstances of the case. When the obligor has expended a substantial sum of money or value or has substantially rearranged his business, as in this case, preparatory to engaging upon the terms of agreement for the benefit of obligee, he ought, through fairness, to have a reasonable time and notice of the cancellation of the contract in order that he might have a reasonable opportunity to put his house in order . . . .' [quoting from *Elson & Co.* v. *Beselin & Son*, 116 Neb. 729, 218 N. W. 753 (1928).]

"It is the settled law of agency that if the agent or employee furnishes a consideration in addition to his mere services, he is deemed to have purchased the employment for at least a reasonable period where the duration of the employment is not otherwise defined." [6]

This Court in other cases, where the contracts in issue contained no express provision respecting material terms, recognized that those terms might be inferred from the language of the contract and the surrounding circumstances. For example, where a buyer agreed to purchase his requirements during a fixed period, but made no express promise to continue in business during that period, we held that such

79 A.2d 224 (1951); 32 ALR 209, 235; *Restatement of Agency* § 442, comment *c* at 1031 (1933); *Restatement of Contracts* §§ 45-47 (1932).

[6] As authority for the statement in the text, Williston cites: *Allied Equipment Co., Inc.* v. *Weber Engineered Products, Inc.*, 237 F.2d 879 (4th Cir. 1956); *Lubrecht* v. *Laurel Stripping Co.*, 387 Pa. 393, 127 A.2d 687 (1956); *Cummings* v. *Kelling Nut Co.*, 368 Pa. 448, 84 A.2d 323 (1951); *Lucacher* v. *Kerson*, 158 Pa. Super. 437, 45 A.2d 245 (1946); *Slonaker* v. *P. G. Publishing Co.*, 338 Pa. 292, 13 A.2d 48 (1940); *Shealy* v. *Fowler*, 182 S.C. 81, 188 S.E. 499 (1936); *Restatement of Agency*, § 442, comment *c* at 1031 (1933). See also *Restatement (Second) of Agency*, § 442, comment *c* at 340 (1957).

*J. C. Millett Co.* v. *Park & Tilford Distillers Corp.*, 123 F. Supp. 484 (N.D. Cal. 1954) also supports the statement in the text: "[W]here a contract of employment or agency for an indefinite period is based on some consideration other than the services to be rendered it will continue for a reasonable period of time." 123 F. Supp. at 429, quoted with approval in *Hunt Foods, Inc.* v. *Phillips*, 248 F.2d 23 (9th Cir. 1957).

The majority opinion in this case attempts to distinguish *Millett* and *Hunt Foods* on the ground that the only consideration flowing to Black Diamond was the personal services to be rendered by the Plaskitts as salesmen. But the Plaskitts furnished consideration in addition to their personal services: they not only devoted their energies, but also expended funds in excess of their commissions in order to promote the sale of Black Diamond's products.

a promise could be inferred from the agreement and surrounding circumstances. *Humble Oil* v. *Cox*, 207 Va. 197, 148 S.E.2d 756 (1966); *Wiseman* v. *Dennis*, 156 Va. 431, 157 S.E. 716 (1931).

Yet this Court balks at permitting the inference that the parties to an exclusive sales contract, which fixed no period for its duration, intend the contract to remain in force for a reasonable period. Reason and the almost unanimous authority support such an inference.[7]

---

[7] The majority opinion says: "Were the court to attempt to fix a date within which the Plaskitts could have made a profit, it would not only be confronted with the involvements incident to determining when a profit had been made, but also how much profit is reasonable." But the trier of fact would be confronted with the same problem of determining the profits recoverable by the Plaskitts if the contract had specified a period for its duration and Black Diamond had breached the contract before the terminal date.